ORDERED PUBLISHED

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.   CC-15-1127-DKiG |
| | ) | |
| EDWARD E. ELLIOTT, | ) | Bk. No.   SV 11-23855-VK |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| EDWARD E. ELLIOTT, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| DIANE C. WEIL, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Submitted on January 21, 2016
at Pasadena, California

Filed - January 28, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Hon. Victoria S. Kaufman, Bankruptcy Judge, Presiding

_____

Appearances:   Andrew Edward Smyth argued for appellant.
John N Tedford, IV, Danning, Gill, Diamond &
Kollitz, LLP argued for appellee.

Before:   DUNN, KIRSCHER AND GAN,[1] Bankruptcy Judges.

_____

[1]   Hon. Scott H. Gan, United States Bankruptcy Judge for the District of Arizona, sitting by designation.

DUNN, Bankruptcy Judge:

The Debtor Edward E. Elliott ("Mr. Elliott") appeals the bankruptcy court's order following remand sustaining the chapter 7[2] trustee's ("Trustee") objection to his homestead exemption claim. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is Mr. Elliott's third appearance before this Panel. While detailed factual background information was included in our two published Opinions in Elliott v. Weil (In re Elliott), 523 B.R. 188 (9th Cir. BAP 2014) ("Elliott I"), and Elliott v. Weil (In re Elliott), 529 B.R. 747 (9th Cir. BAP 2015) ("Elliott II"), we include some of that factual background here to provide context for the current decision.[3]

1. Events in the Main Case through Elliott I

Mr. Elliott filed for relief in chapter 7 on December 1, 2011. In his petition and schedules, signed under penalty of perjury, he stated his address as Hiawatha Street in Granada Hills, California; he did not list any real property in which he

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[3] The parties have provided a limited record on appeal. We have exercised our discretion to review additional documents filed in the electronic records of Mr. Elliott's main case, Case No. SV 11-23855-VK ("Main Case"), and the related adversary proceeding, Case No. SV 13-01118-VK ("Adversary Proceeding"). See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

2

had an interest or in which creditors held secured claims; he did not claim entitlement to a homestead exemption on Schedule C; he did not disclose any ownership interest in a corporation on Schedule B; and he did not list creditors ("Judgment Creditors") who had obtained a judgment against him in 2006 for fraud and negligent misrepresentation or any secured creditors.

At his § 341(a) meeting of creditors, Mr. Elliott confirmed his address as Hiawatha Street, and he testified under oath that he had read his bankruptcy papers before he had signed them and that they were true and complete to the best of his knowledge. He also testified that he had listed everything of value that he owned and that he had listed everyone he owed money to in his schedules. He further testified that he did not own any real property and that he had not sold, transferred or given away anything of value in the last four years.

Based on the information disclosed by Mr. Elliott in his schedules and in his testimony at the § 341(a) meeting, the Trustee filed a "No Distribution" report, Mr. Elliott received his discharge, and the case was closed on March 13, 2012. Less than two weeks later, Lee Wong Investments, Inc. ("LWI") transferred a residential real property in Los Angeles, California (the "Buckingham Property") to Mr. Elliott by quitclaim deed "as a gift." LWI is a Nevada corporation that Mr. Elliott does not dispute he organized prepetition and controls. Shortly thereafter, Mr. Elliott sent a letter to counsel for the Judgment Creditors stating that he had acquired the Buckingham Property after his bankruptcy and demanding that their judgment liens be removed. His letter caused the Judgment Creditors to

3

investigate the history of title transactions with respect to the Buckingham Property.

As detailed in Elliott I, since 2006, Mr. Elliott had maintained a continuous interest in the Buckingham Property that was disguised through a series of transfers. On the date of his bankruptcy filing, Mr. Elliott owned the Buckingham Property through his wholly-owned corporation, LWI. However, as noted above, Mr. Elliott did not disclose any ownership interest in either the Buckingham Property or LWI in his schedules and did not even disclose his judgment debt to the Judgment Creditors. So, the title manipulations as to the Buckingham Property remained undetected until after Mr. Elliott received his discharge and his bankruptcy case was closed.

The Judgment Creditors moved to reopen Mr. Elliott's bankruptcy case, which motion was granted, and the Trustee was reappointed to serve in the reopened case. Mr. Elliott did not amend his schedules to disclose his interest in the Buckingham Property until nearly a year later. In his amended schedules, Mr. Elliott included the Buckingham Property in his amended Schedule A, valued at $360,000, and stated that Bank of America held a $120,826 secured claim against it. He also claimed a $175,000 homestead exemption in the Buckingham Property in his amended Schedule C under Cal. Code Civ. P. § 704.730(a)(3). He neglected to list over $100,000 in outstanding real property taxes assessed against the Buckingham Property. Based on Mr. Elliott's valuation of the Buckingham Property, if his homestead exemption claim were allowed, there would be nothing for his bankruptcy estate.

4

The Trustee filed a timely objection to Mr. Elliott's claimed homestead exemption in the Buckingham Property on the basis of bad faith, and the bankruptcy court sustained the objection. Mr. Elliott appealed the denial of his exemption claim to this Panel, and while the appeal was pending, the Supreme Court issued its decision in Law v. Siegel, 571 U.S. ___, 134 S.Ct. 1188 (2014).

Based on our conclusion that Law v. Siegel precluded bankruptcy courts from denying claimed exemptions or amendments to claimed exemptions based on a debtor's bad faith as a matter of equity, the Panel vacated the bankruptcy court's order denying Mr. Elliott's homestead exemption claim as to the Buckingham Property but remanded for the bankruptcy court to determine if Mr. Elliott's homestead exemption claim could be denied on some other basis under federal bankruptcy or California state law. See Elliott I, 523 B.R. at 193-98.

2. Events in the Adversary Proceeding through Elliott II

Meanwhile, the Trustee had filed the Adversary Proceeding to revoke Mr. Elliott's discharge and to require that the Buckingham Property be turned over to the Trustee on behalf of the bankruptcy estate under § 542(a). The Trustee also conducted a continued § 341(a) meeting at which Mr. Elliott admitted that he lived at the Buckingham Property when he filed his bankruptcy petition, that he considered it to be his home, and that he had purchased it in 1989.

After filing a motion for an order setting aside his default, Mr. Elliott filed an answer to the Adversary Proceeding complaint in pro se that did not assert any affirmative defenses.

5

After obtaining counsel, he filed an amended answer asserting as his only affirmative defense that any "mistakes on the schedules were the result of debtor's attorney's mistakes."

In January 2014, the Trustee filed a motion for summary judgment ("Summary Judgment Motion") in the Adversary Proceeding seeking revocation of Mr. Elliott's discharge under § 727(d)(1) and turnover of the Buckingham Property. Mr. Elliott opposed the Summary Judgment Motion. The bankruptcy court held a hearing on the Summary Judgment Motion on March 19, 2014, at which the parties appeared through counsel and argued their positions. On April 7, 2014, the bankruptcy court granted the Summary Judgment Motion and entered a "Judgment Vesting Property in Trustee and Revocation of Discharge." Mr. Elliott appealed.

On appeal, the Panel vacated the judgment. It concluded that the Trustee's discharge revocation claim was barred by the running of the limitations period in § 727(e)(1) and had to be remanded for dismissal. The turnover portion of the judgment likewise was vacated and remanded, in light of the Panel's prior determination in Elliott I that denial of Mr. Elliott's homestead exemption claim on bad faith grounds was inappropriate, for the bankruptcy court to make findings as to whether the Buckingham Property was "of inconsequential value or benefit to the estate," as required under § 542(a). See Elliott II, 529 B.R. at 754-55.

3. Events in the Adversary Proceeding Following Remand

Following remand of the Adversary Proceeding, the bankruptcy court dismissed the Trustee's claim to revoke Mr. Elliott's discharge and established a schedule for the parties to submit legal memoranda and evidence as to whether the estate's interest

6

in the Buckingham Property was sufficiently consequential to warrant turnover.

The Trustee submitted a brief ("Valuation Brief") supported by the declarations of the Trustee, her counsel Aaron E. De Leest, and appraiser David S. Serber. The Trustee had obtained appraisals of the Buckingham Property as of April 7, 2014 ($580,000) and as of June 15, 2015 ($600,000). Unpaid real property taxes and associated penalties as of June 24, 2015, for 2006 through 2011 and 2013 through 2015 totaled $107,495.05.

The Community Development Department of the City of Los Angeles ("CDD") had a deed of trust recorded against the Buckingham Property on January 10, 1986, securing an indebtedness of $25,000. Bank of America, N.A. ("B of A") had a deed of trust recorded against the Buckingham Property on November 12, 2004, securing an indebtedness of $120,360.77 as of June 15, 2015. The Trustee did not contest the validity or priority of the CDD and B of A trust deed liens.

A deed of trust in favor of Hollywood Damage Control & Recovery ("HDCR") to secure an indebtedness in the amount of $800,000 was recorded on October 31, 2005. However, the Trustee had avoided and preserved the HDCR trust deed lien for the benefit of the estate. Los Angeles County (the "County") had recorded a personal property tax lien against the Buckingham Property in the amount of $1,449.75 on June 9, 2005. For purposes of the Adversary Proceeding, the Trustee assumed the validity of the County's lien.

A judgment in the amount of $127,134.00 in favor of the Inglewood Family Corporation ("IFC") had been entered on May 13,

7

2005, against Mr. Elliott and another entity and had been recorded as a judgment lien against the Buckingham Property. However, the judgment was not renewed by IFC within 10 years after it was entered. Accordingly, under Cal. Code Civ. P. § 683.020, the judgment was no longer enforceable, and the judgment lien was extinguished. The Judgment Creditors also had obtained judgment liens against the Buckingham Property, but by stipulation with the Trustee approved by the bankruptcy court, the Judgment Creditors had agreed that the Buckingham Property could be sold free and clear of their judgment liens, and their claims would be treated as nonpriority unsecured claims in the Main Case. Finally, the Trustee projected 8% costs of sale (including a 6% real estate commission) with respect to the Buckingham Property.

The Trustee recognized that she bore the burden of proof to establish that the estate was entitled to turnover of the Buckingham Property, but argued that Mr. Elliott had the burden to establish that the property had no consequential value or benefit for the estate. Then, through various calculations, the Trustee ultimately presented a demonstration that if the Buckingham Property were valued at $600,000, after payment of priority liens, the net value for the estate would be $297,694.43 (allowing for payment of the County's personal property tax lien) or $299,144.18 (if the County's personal property tax lien were treated as subordinate). In either event, the Trustee argued that the Buckingham Property had "consequential value and benefit to the estate."

Mr. Elliott opposed ("Opposition"). He had obtained an

8

appraisal for the Buckingham Property as of April 15, 2014 valuing it at $450,000. Deducting costs of sale and the uncontested liens of CDD, B of A and for real property taxes, totaling approximately $252,856, would leave a balance of approximately $197,144. Ignoring the Trustee's argument that she stepped into the shoes of the avoided HDCR trust deed lien, Mr. Elliott argued that if he prevailed on his homestead exemption claim, there would be no significant payout to unsecured creditors. He further requested a continuance to obtain a current appraisal of the Buckingham Property.

The bankruptcy court heard the issue as to whether consequential value to the estate supported turnover as claimed by the Trustee at a hearing ("Turnover Hearing") on July 22, 2015. At the Turnover Hearing, counsel for Mr. Elliott requested time to obtain an update of his appraisal of the Buckingham Property, agreeing with counsel for the Trustee that the bankruptcy court should make its determination based on the current value of the property as at June 15, 2015. That request was granted, but ultimately, Mr. Elliott agreed with the Trustee's $600,000 valuation for the property.

Following the Turnover Hearing, the bankruptcy court issued written findings of fact and conclusions of law ("Findings") on August 13, 2015. In its Findings, the bankruptcy court found that the lien for unpaid real property taxes and the trust deed liens of CDD and B of A amounted to $107,495.05, $25,000, and $120,360.77, respectively, for a total of approximately $252,855.82 as of June 15, 2015. At the Turnover Hearing, counsel for Mr. Elliott represented that nothing was owed to HDCR

9

and that Mr. Elliott had obtained a reconveyance of HDCR's trust deed. For purposes of determining whether the Buckingham Property was of inconsequential value or benefit to the estate, the bankruptcy court assigned a value of $0.00 to the HDCR trust deed lien. Based on the absence of evidence other than as reflected in the Trustee's preliminary title report for the Buckingham Property dated June 15, 2015, the bankruptcy court valued the County's personal property tax lien at $1,449.75. As for IFC's judgment lien, since it was unenforceable under California law, the bankruptcy court assigned it a value of $0.00. Because of the Trustee's approved stipulation with the Judgment Creditors, the bankruptcy court assigned a value of $0.00 to their judgment liens.

Based on the record of evidence and arguments made by the parties, the bankruptcy court determined the net value of the Buckingham Property for the benefit of the estate, exclusive of Mr. Elliott's homestead exemption claim, as $297,694.43, calculated as follows:

| | |
|---|---|
| Value | $600,000.00 |
| Less: | |
| Estimated costs of sale (8% of gross value) | $ 48,000.00 |
| Real property taxes and penalties | 107,495.05 |
| CDD lien | 25,000.00 |
| B of A lien | 120,360.77 |
| HDCR lien | 0.00 |
| County personal property tax lien | 1,449.75 |
| IFC judgment lien | 0.00 |
| Judgment Creditors judgment liens | 0.00 |
| Total Net Value | $297,694.43 |

Recognizing that Mr. Elliott still was pursuing a homestead exemption claim for $175,000, the bankruptcy court found that even if Mr. Elliott prevailed on his homestead exemption claim,

10

subtracting $175,000 from $297,694.43 would leave $122,694.43 of net value available to the estate. Accordingly, with or without allowing a homestead exemption, the Buckingham Property was not of "inconsequential value or benefit to the estate." The bankruptcy court noted that this Panel's decision in Elliott II had not disturbed its prior determinations that 1) the Buckingham Property was property of Mr. Elliott's bankruptcy estate; 2) title to the Buckingham Property was vested in the Trustee; and 3) the Buckingham Property could be used, sold or leased by the Trustee under § 363. Accordingly, the bankruptcy court would enter a judgment requiring Mr. Elliott to turn over the Buckingham Property to the Trustee.

One day later, on August 14, 2015, the bankruptcy court entered a judgment ("Turnover Judgment") on the Trustee's § 542(a) claim consistent with its Findings, determining that the Buckingham Property was property of Mr. Elliott's bankruptcy estate, vested in the Trustee, and requiring that Mr. Elliott "immediately deliver and turn over possession of the Buckingham Property to the Trustee." The Turnover Judgment was not appealed.

4.  Events in the Main Case following remand

Following remand in the Main Case under Elliott I, the bankruptcy court established a briefing schedule for the parties to submit further legal memoranda and supporting evidence on the issues as to whether the Trustee's objection to Mr. Elliott's claimed homestead exemption could be sustained 1) under § 522(g)(1), or 2) based on Mr. Elliott's failure to satisfy the California state law requirement for an "automatic Article 4"

homestead exemption, i.e., that Mr. Elliott have resided at the Buckingham Property continuously from the time a judgment creditor's lien attached to the property until the court could determine that the subject dwelling was in fact a homestead.

On February 13, 2015, the Trustee filed her memorandum in support of Trustee's objection to Mr. Elliott's claimed homestead exemption ("Trustee Memorandum"), supported by Mr. Elliott's petition filed in the Main Case; transcripts of his testimony under oath at the original and subsequent § 341(a) meetings; a transcript of Mr. Elliott's deposition testimony; and a copy of the declaration of Juanita Jehdian, Mr. Elliott's fiancee. The Trustee began her argument with respect to the application of § 522(g)(1) by quoting the relevant provisions of the statute:

> Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if –
> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
> (B) the debtor did not conceal such property . . . .

The Trustee then posited that it was clear that Mr. Elliott concealed the Buckingham Property both from the Trustee and from the bankruptcy court, relying on a portion of the analysis from this Panel in Elliott I:

> The essence of Elliott's appeal in utilizing Law v. Siegel to shield his misconduct from functioning as lawful grounds to deny his homestead exemption has led to, as Trustee bluntly but accurately asserts, Elliott practically admitting he concealed the asset and acted in bad faith. Indeed, Elliott does not dispute that he failed to disclose his interest in the Buckingham Property in his original schedules. He admits claiming Hiawatha Street as his "street address" on his petition

12

even though he knew he did not live there. Elliott further acknowledges that at the § 341(a) meeting he claimed his forms were true and complete, all the while knowing the bankruptcy court had no knowledge of the Buckingham Property he allegedly resides in and controlled through LWI.

Accordingly, we conclude that § 522(g)(1) is applicable and an important limitation on Elliott's claimed homestead exemption for the bankruptcy court to consider on remand.

Elliott I, 523 B.R. at 198.

With respect to Mr. Elliott's automatic homestead claim under California law, the Trustee admitted that "continuous residency, rather than continuous ownership, controls the Article 4 analysis." The Trustee then surveyed the available evidence from Mr. Elliott's petition and schedules; his § 341(a) meeting testimony; his deposition testimony; and the declaration of Juanita Jehdian. The Trustee noted that from the outset of the Main Case, Mr. Elliott asserted that his address was on Hiawatha Street; he did not disclose any interest in the Buckingham Property or the corporation that nominally held title to the Buckingham Property; and he asserted without qualification that his bankruptcy papers were true and complete. Only after the Main Case was reopened at the behest of the Judgment Creditors did he begin to temporize. Following reopening, Mr. Elliott amended his schedules to include the Buckingham Property and assert a homestead exemption in it, and he testified at the second § 341(a) meeting that he lived there; he considered it his home; and he purchased it in 1989. However, when the Trustee asked him about the Hiawatha Property, Mr. Elliott testified, "That was a uh place where my fiancé [sic] and her son and I was, would come over there quite a bit." At his deposition, Mr.

13

Elliott was asked and answered the following questions:

Q. "[Y]ou said you were living in and out of the Hiawatha Street; is that correct?"

A. "That's correct."

Q. "How long did you live there before moving back to Buckingham [Property]?"

A. "It was not a permanent address for me."

In her declaration, Ms. Jehdian stated that she had been a frequent visitor to the Buckingham Property and that she knew that Mr. Elliott resided there in December 2011.

The Trustee recognized that claimed exemptions are presumptively valid, and the objecting party bears the burden of proving that an exemption is not properly claimed. See, e.g., Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029-30 n.3 (9th Cir. 1999). However, once the Trustee produces evidence to rebut the presumption, the burden shifts to Mr. Elliott to present "unequivocal evidence to demonstrate the exemption is proper." Id. The Trustee's analysis of the evidence in Mr. Elliott's case was that the bankruptcy court was "clearly placed in a vexed position to decide which of [Mr. Elliott's] lies are to be believed and how to determine credibility of his inconsistent statements and filings." In these circumstances, the Trustee argued that Mr. Elliott simply could not present unequivocal evidence to establish that his homestead exemption claim in the Buckingham Property was appropriate, and her objection to the claimed homestead exemption should be sustained.

In his opposing response ("Response"), Mr. Elliott argued that § 522(g)(1) simply was not applicable because "[t]here is no

14

Court order in this case setting aside a transfer." He also submitted his own supporting declaration with evidence that he continuously resided at the Buckingham Property and was living there on the petition date.

The bankruptcy court heard the matter at a hearing on March 19, 2015 ("Exemption Objection Hearing"). The bankruptcy court posted a tentative ruling in advance of the Exemption Objection Hearing sustaining the Trustee's objection to Mr. Elliott's homestead exemption claim based on the application of § 522(g)(1). The tentative ruling was not included in Mr. Elliott's excerpts of record, but it is included as item number 94 on the Main Case docket, and we have reviewed it. At the Exemption Objection Hearing itself, after hearing arguments from counsel, the bankruptcy court announced its ruling denying a homestead exemption to Mr. Elliott applying § 522(g)(1) based on the following analysis:

> [The Buckingham Property] was property of the estate subject to turnover. The residence was subject to turnover because [Mr. Elliott] held it in a wholly-owned corporation which he didn't disclose in his schedules or at his 341(a). He concealed that that's where he lived. He didn't put it on his petition. He didn't inform the [Trustee] during his 341(a) that's where he lived. He didn't list his interest in the corporation that held the property. He then three weeks after he got his discharge . . . transferred the property back to himself in his own name, and then wrote a letter to creditors about how their liens against the property weren't good because it was after acquired and he had gotten a discharge. So, they couldn't have liens against this property that he had always held in his own corporation and hadn't disclosed as his residence.
>
> . . . .
>
> So, I mean, the point is that he – I mean, he doesn't even dispute that he concealed it. He's just saying that, well, that the turnover action isn't sufficient to satisfy

15

522(g)(1), but, I mean, 542 satisfies, and we have a judgment. And I guess if it gets reversed then we'll have to revisit it, but it's not reversed yet, and we're going to say he doesn't get a homestead exemption based on 11 U.S.C. Section 522(g)(1).

March 19, 2015 Hr'g Tr., at 9:21-10:23.

Counsel for the Trustee submitted an order ("Exemption Denial Order") consistent with the bankruptcy court's oral ruling sustaining the Trustee's objection to Mr. Elliott's homestead exemption claim that the bankruptcy court signed and entered on April 8, 2015. Mr. Elliott filed a timely appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). An order denying a debtor's exemption claim is a final order. Preblich v. Battley, 181 F.3d 1048, 1056 (9th Cir. 1999). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err in denying Mr. Elliott's claimed homestead exemption under § 522(g)(1), by its terms or as a result of the Supreme Court's decision in Law v. Siegel?

2. Did the bankruptcy court err in failing to rule on Mr. Elliott's entitlement to a homestead exemption claim under California law?

## IV. STANDARDS OF REVIEW

The denial of a debtor's exemption claim presents questions of law that we review de novo. Kelley v. Locke (In re Kelley), 300 B.R. 11, 16 (9th Cir. BAP 2003). De novo review means that we review a matter anew, as if no decision previously had been rendered. Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009).

We review the bankruptcy court's fact findings underlying

16

its legal conclusions for clear error. <u>Bronitsky v. Bea (In re Bea)</u>, 533 B.R. 283, 285 (9th Cir. BAP 2015). We must affirm the bankruptcy court's fact findings unless we determine that those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" <u>United States v. Hinkson</u>, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc), quoting <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 577 (1985).

We may affirm the decision of the bankruptcy court on any basis supported by the record. <u>ASARCO, LLC v. Union Pac. R.R. Co.</u>, 765 F.3d 999, 1004 (9th Cir. 2014); <u>Shanks v. Dressel</u>, 540 F.3d 1082, 1086 (9th Cir. 2008).

V.   DISCUSSION

As in <u>Elliott I</u>, Mr. Elliott brandishes the Supreme Court's decision in <u>Law v. Siegel</u> as a talisman to ward off the Trustee's objection to his homestead claim in the Buckingham Property. So we commence our analysis by considering exactly what the Supreme Court decided and did in <u>Law v. Siegel</u> and what it did not do.

A.   <u>Law v. Siegel and its implications in this appeal</u>

Stephen Law filed a chapter 7 case and claimed a homestead exemption in his residence property ("Residence"). The trustee did not object, and Mr. Law's homestead exemption was allowed. Mr. Law also listed two liens against the Residence: a first deed of trust for $146,156.52 in favor of Washington Mutual Bank and a second deed of trust for $156,929.04 in favor of "Lin's Mortgage & Associates," securing an alleged debt to a person named "Lili Lin." After lengthy and expensive litigation over a period of years, the bankruptcy court found that "no person named Lili Lin

17

ever made a loan to [Mr. Law] in exchange for the disputed deed of trust," and "the loan was a fiction, meant to preserve [Mr. Law's] equity in his residence beyond what he was entitled to exempt" by perpetrating "a fraud on his creditors and the court." Law v. Siegel, 134 S.Ct. 1188, 1193 (2014). Consistent with applicable Ninth Circuit law at the time, see Latman v. Burdette, 366 F.3d 774 (2004), the bankruptcy court "surcharged" Mr. Law's homestead exemption to pay a portion of the trustee's attorney's fees.

Mr. Law appealed, and this Panel and the Ninth Circuit affirmed the bankruptcy court, but the Supreme Court granted certiorari and reversed. It concluded that although bankruptcy courts have authority under § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." Id. at 1194, quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105-06 (16th ed. 2013). Specifically, in Mr. Law's case, the Supreme Court held that surcharging Mr. Law's homestead exemption under § 105(a) or under the bankruptcy court's inherent sanctioning authority was invalid in light of § 522(k)'s specific directive that property that a debtor properly exempts generally "is not liable for payment of any administrative expense." Law v. Siegel, 134 S.Ct. at 1195.

The Supreme Court did not stop there in Law v. Siegel. Underlining its larger point that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code, id. at 1194, quoting

18

Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988), the Supreme Court went on to state that "§ 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate." Law v. Siegel, 134 S.Ct. at 1196. It concluded that the Bankruptcy Code does not confer on bankruptcy courts "a general, equitable power . . . to deny exemptions based on a debtor's bad-faith conduct." Id. We listened, and that was the basis for our decision to vacate and remand in Elliott I, founded on our conclusion that Law v. Siegel "abrogated our authority to deny exemptions or amendments to exemptions based on a debtor's bad faith." Elliott I, 523 B.R. at 193.

However, the Supreme Court also recognized that "§ 522 sets forth a number of carefully calibrated exceptions and limitations [to debtors' exemptions], some of which relate to the debtor's misconduct." Id. Law v. Siegel does not evince any overweening affection or solicitude for dishonest debtors in bankruptcy by the Supreme Court. In fact, the Supreme Court has repeatedly emphasized that "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the '**honest** but unfortunate debtor.'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007), quoting Grogan v. Garner, 498 U.S. 279, 286 (1991), and Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934) (emphasis added). But, the Supreme Court in Law v. Siegel sent a clear message: "The Code's meticulous – not to say mind-numbingly detailed – enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." Law v. Siegel, 134 S.Ct. at 1196, citing

19

Hillman v. Maretta, 133 S.Ct. 1943, 1953 (2013); and TRW Inc. v. Andrews, 534 U.S. 19, 28-29 (2001).

Among those detailed exceptions is § 522(g)(1). We noted in Elliott I that § 522(g)(1) might apply to support denial of Mr. Elliott's homestead exemption claim in the Buckingham Property, see Elliott I, 523 B.R. at 197-98, and the bankruptcy court in fact based its decision to deny Mr. Elliott's homestead exemption claim following remand on § 522(g)(1). Accordingly, we proceed to review application of § 522(g)(1) in this case.

B. Section 522(g)(1) – its terms and application

Section 522(g)(1), in relevant part, provides:

[T]he debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if –
    (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
    (B) the debtor did not conceal such property . . . .

We begin our analysis by focusing, as we must, on the operative terms of the statute. "The starting point in discerning congressional intent is the existing statutory text." Lamie v. United States Trustee, 540 U.S. 526, 534 (2004), citing Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999). "It is well established that 'when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'" Lamie v. United States Trustee, 540 U.S. at 534, quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000).

As stated in Collier's, § 522(g) "allows the debtor to

20

exempt property that the trustee recovers under [various sections of the Bankruptcy Code, § 542 being relevant in this case] as long as the transfer was **involuntary** and the property was **not concealed** by the debtor." 4 <u>Collier on Bankruptcy</u> ¶ 522.12[1] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) (hereinafter cited as <u>Collier on Bankruptcy</u>) (emphasis in original). There is no real dispute here about concealment. "The debtor might be found to have concealed the property if the debtor takes affirmative action to mislead creditors about whether particular property existed." 4 <u>Collier on Bankruptcy</u> ¶ 522.12[2][b].

When Mr. Elliott filed his bankruptcy petition and schedules, he stated under penalty of perjury that he had no interest in the Buckingham Property or the corporation that held title to the Buckingham Property. He further did not schedule any secured or judgment lien creditors whose lien claims might have alerted the Trustee to Mr. Elliott's connection to the Buckingham Property.

While Mr. Elliott quibbles in his opening brief that he included the Hiawatha Street address as his "street address" rather than his "residence" in his petition and never stated at the initial § 341(a) meeting that he resided at Hiawatha Street, he concedes that he failed to disclose in his schedules: 1) his ownership interest in the Buckingham Property; 2) his ownership interests in two corporations that he controlled and owned; and 3) the claim of at least one judgment creditor. He further concedes that he stated under oath at his § 341(a) meeting that he did not own any real property and that he did not sell or give away anything of value in the previous four years. Appellant's

21

Opening Brief, at 9-10. At the Exemption Objection Hearing, Mr. Elliott's counsel conceded that Mr. Elliott "did not disclose the company. He did not disclose the property." We conclude that the bankruptcy court did not err in finding that Mr. Elliott concealed his interest in the Buckingham Property for purposes of § 522(g)(1)(B).

The bankruptcy court found that the Trustee's judgment in his § 542(a) turnover action constituted a recovery under § 542 for purposes of § 522(g).[4] This Panel previously considered the meaning of the term "recover" in the context of § 522(g) in Hitt v. Glass (In re Glass), 164 B.R. 759, 763 (9th Cir. BAP 1994), aff'd, 60 F.3d 565 (9th Cir. 1995):

> As to everyday usage, Webster's defines "recover' as "to get back" or "to regain." Webster's New World Dictionary 1122 (3d ed. 1988). In the legal context, "recover" is defined as above, but is also defined as "to be successful in a suit, to collect or obtain amount, to have judgment, to obtain favorable or final judgment, to obtain in any legal manner in contrast to voluntary payment." Black's Law Dictionary 1147 (5th ed. 1979).

In the Exemption Denial Order, the bankruptcy court made the following specific findings:

> On June 4, 2013, Trustee filed a turnover action against [Debtor] for the . . . [Buckingham] Property under § 542. Trustee has succeeded in that action. Hence, this constitutes a "recovery" as contemplated by § 522(g), which then brings the . . . Property within the scope of the § 522(g)(1) limitation on [Mr. Elliott's] right to claim an exemption in property he voluntarily transferred and concealed.

---

[4] The judgment that existed at the time the bankruptcy court made that finding subsequently was vacated in Elliott II. However, following remand and further proceedings in the Adversary Proceeding, the corresponding Turnover Judgment was entered, was not appealed and is final.

Exemption Denial Order, at 5.

Mr. Elliott does not contest that the Trustee made a "recovery" under § 542 in the Adversary Proceeding. He could not do so credibly. Mr. Elliott opposed the Trustee's claim for turnover of the Buckingham Property at every stage of the Adversary Proceeding up to the entry of the Turnover Judgment. His apparent defense was based on the argument that unpaid real property taxes coupled with consensual liens, with or without his claimed homestead exemption, ate up the entire value of the Buckingham Property, leaving nothing for the bankruptcy estate. The bankruptcy court ultimately rejected that argument, finding total value of the Buckingham Property net of tax liens and allowable consensual liens to be $297,694.43. Even if Mr. Elliott prevailed on his $175,000 homestead exemption claim, $122,694.43 of "consequential" net value would remain for the estate. As noted above, the Turnover Judgment based on these findings was not appealed.[5]

---

[5] Interestingly, as late as the Exemption Objection Hearing, Mr. Elliott's counsel asserted that the $800,000 HDCR trust deed lien, which "the [Trustee] says it's phony," was "way too old to get rid of, therefore there [is] no equity." Yet, in the Opposition to the Trustee's Valuation Brief, Mr. Elliott did not even mention the HDCR trust deed lien. And, in its Findings, the bankruptcy court noted that counsel for Mr. Elliott represented at the Turnover Hearing that nothing was actually owed to HDCR, and Mr. Elliott had obtained a reconveyance of HDCR's trust deed. On this record, one might reasonably conclude that HDCR was Mr. Elliott's "Lili Lin." Fortunately, we do not have to consider this matter further in the disposition of this appeal.

23

Mr. Elliott does argue that § 522(g)(1) is inapplicable to deny his homestead exemption claim because the Trustee did not recover property that was "transferred" for the benefit of the estate in his § 542 action, and "the reference to Section 542 [in § 522(g)(1)] describes one of the mechanisms for recovering a transfer."  We disagree with Mr. Elliott's argument for the following reasons.

First, in § 522(g) itself, there is no explicit link between the language  "property that the trustee recovers under section . . . 542" and "to the extent that the debtor could have exempted such property . . . if such property had not been transferred." The statute by its terms does not require that the recovery be of or from a transfer.

Section 542(a), pursuant to which the Trustee obtained the Turnover Judgment, provides in relevant part:

> [A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

"Possession, custody or control" is not a defined term in the Bankruptcy Code, but the statute requires that the subject property must have been in the possession, custody or control of a third party "during the case."  5 Collier on Bankruptcy ¶ 542.02[1].  "'During the case' has been held to include the pendency of the overall bankruptcy case and not just the adversary proceeding seeking turnover."  Id.  See Beaman v. Vandeventer Black, LLP (In re Shearin), 224 F.3d 353, 356 (4th

24

Cir. 2000), cert. denied, 531 U.S. 1149 (2001); and Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re USA Diversified Prods., Inc.), 100 F.3d 53, 55-56 (7th Cir. 1996). There is no dispute that on the petition date, LWI rather than Mr. Elliott held title to the Buckingham Property.

In the Exemption Denial Order, the bankruptcy court made the following findings:

> Debtor [Mr. Elliott] voluntarily transferred title to the [Buckingham] Property to a corporation owned by the son of Debtor's business partner. Later, Debtor again transferred the Property to a corporation that was wholly owned by Debtor. In his bankruptcy petition and schedules and during his § 341(a) meeting of creditors, Debtor concealed these transfers and his interest in the Property. After he received his discharge, Debtor transferred the Property back into his name.

Exemption Denial Order, at 5. Mr. Elliott does not dispute those findings. So, on the petition date, the transfer to LWI was still in effect. Based on the schedules Mr. Elliott filed, he could not claim an exemption in the Buckingham Property because he affirmed under penalty of perjury that he did not have an exemptible interest in the property. "If the exempt property is transferred, the debtor has in essence waived the exemption . . . ." Fox v. Smoker (In re Noblit), 72 F.3d 757, 758 (9th Cir. 1995). And as Mr. Elliott admits, exemptions are determined as of the petition date. See § 522(b)(3)(A); 4 Collier on Bankruptcy ¶ 522.05[1]; Wolfe v. Jacobson (In re Jacobson), 676 F.3d 1193, 1199 (9th Cir. 2012), citing White v. Stump, 266 U.S. 310, 313 (1924); In re Dore, 124 B.R. 94, 98 (Bankr. S.D. Cal. 1991).

This Panel and the Ninth Circuit faced a similar situation in Glass v. Hitt (In re Glass), 164 B.R. 759 (9th Cir. BAP 1994),

25

aff'd, 60 F.3d 565 (9th Cir. 1995).  In Glass, prior to filing his chapter 7 bankruptcy petition, the debtor ("Mr. Glass") had transferred title to his residence to his son for "love and affection."  Mr. Glass did not list the residence as an asset in his schedules and did not disclose the transfer in his statement of financial affairs.  He further did not claim a homestead exemption in the residence.  Glass, 60 F.3d at 567.  At the § 341(a) meeting of creditors, a creditor told the trustee about the prepetition transfer of the residence property.  Id.  Thereafter, Mr. Glass amended his schedules to list a fee interest in the residence and claimed a homestead exemption.  Id.

The trustee objected to Mr. Glass' homestead exemption claim, contending that since Mr. Glass did not claim any interest in the residence in his original schedules and had voluntarily conveyed the residence to his son for no consideration, § 522(g) "precluded [Mr. Glass] from relying on the homestead exemption authorized by § 522(b)."  Glass, 164 B.R. at 760-61.  In addition, in the objection, the trustee stated his intent to seek avoidance of the conveyance as a fraudulent transfer under § 548.  Id. at 761.  Before such an adversary proceeding was filed (and even before a demand for turnover had been made), Mr. Glass' son reconveyed the residence to Mr. Glass, again in consideration of "love and affection."

The bankruptcy court overruled the trustee's objection "holding [Mr.] Glass was entitled to claim the homestead exemption under section 522(b) because the trustee did not direct any action against the transferee son to achieve reconveyance of the residence to the estate, and thus, the trustee did not

26

'recover' any property." Glass, 60 F.3d at 567.  This Panel reversed, and the Ninth Circuit affirmed the reversal, quoting with approval this Panel's holding that, "The purpose of § 522(g) is to prevent a debtor from claiming an exemption in recovered property which was transferred in a manner giving rise to the trustee's avoiding powers, where the transfer was voluntary or where the transfer or property interest was concealed." Id. at 568-69.  See also Greenwood v. Clark (In re Greenwood), 593 F. App'x 680 (Feb. 13, 2015).

In this case, the Trustee recovered the Buckingham Property under § 542(a) through the Turnover Judgment in the Adversary Proceeding.  Mr. Elliott could have exempted the Buckingham Property in his original schedules on the petition date if he had disclosed it as real property in which he claimed an interest, despite its transfer to LWI, but he did not disclose an exemptible interest in the property.  Mr. Elliott's transfers of the Buckingham Property were voluntary, and he concealed his interest in the Buckingham Property in his petition and schedules and in his testimony at the § 341(a) meeting. On this record, we conclude that the bankruptcy court did not err in sustaining the Trustee's objection to Mr. Elliott's claimed homestead exemption in the Buckingham Property under § 522(g)(1).

C.  No need to rule on California exemption law

Mr. Elliott argues that the bankruptcy court erred in failing to analyze whether Mr. Elliott's misconduct warranted denial of his homestead exemption claim under California state law.  Since the bankruptcy court appropriately denied Mr. Elliott's claimed homestead exemption under an applicable

27

Bankruptcy Code provision, § 522(g)(1), it fully resolved the Trustee's objection and was not required to proceed further to analyze Mr. Elliott's homestead exemption claim under state law.

CONCLUSION

Based on the foregoing analysis and conclusions, we AFFIRM.